## Raydure v. Board of Supervisors, Estill County.

(Decided January 31, 1919.)

### Appeal from Estill Circuit Court.

1. Taxation—Discrimination Between Non-resident and Resident Owners Not Allowable.—The legislature has no power to subject to taxation the property of non-residents in this state if like property owned by residents is exempt from taxation.

2. Taxation—Of Mineral Rights and Leases of Non-residents.—The fact that the legislature provides a different method of ascertaining the value and character of property owned by non-residents in this state in order that it may be assessed, from that provided for the assessment of like property of residents is not discrimination.

3. Taxation—Schedule of Property Subject to Assessment—Assessment of Property Not Mentioned in.—Although assessable property of a particular description may not be mentioned in the tax schedule it is subject to assessment and taxation under section 4020 of Kentucky Statutes and the item in the schedule providing for the assessment of the value of "property not mentioned in the schedule."

4. Taxation—Oil Leases.—Oil leases giving the lessee the exclusive privilege for a specified time of exploring for and producing oil on the leased premises is property that may be assessed for taxation.

5. Taxation—Definition of Word "Property."—In its broad sense the word "property" embraces every species of valuable right and interest, including real and personal property, easements, franchises and hereditaments that a person owns.

6. Taxation—Definition of Property That Has Assessable Value and May Be Taxed.—Under our Constitution all property that has a cash value in any amount and that may be the subject of barter and sale is subject to assessment and taxation. The test is—Has it a cash value in some amount and if offered for sale could any bidder be found that would pay a cash price for it in any sum?

7. Taxation—Ascertainment of Fact Whether Property is Subject to Assessment.—A dispute between the taxpayer and assessing authorities as to whether certain property has any assessable value is a question of fact that must be determined as are other disputed issues of fact.

8. Taxation—Oil Leases.—Oil leases if they have any cash value are subject to assessment although there may be producing wells on the territory covered by the leases on which a production tax on the oil produced is paid by the owner of the lease.

9. Taxation—Oil Leases—Oil Production Tax.—Legislature may fix a production tax on the value of oil produced but it must not be an unreasonable or arbitrary tax.

10. Taxation—Oil Leases—Production Tax on Oil is a License Tax.— The act providing for an oil production tax is a license tax on the business of producing oil and is authorized by section 181 of the Constitution.

11. Taxation—License Tax—Property Tax.—In addition to the ad valorem property tax authorized by section 171 of the Constitution a license tax may be imposed on any trade, occupation or profession.

12. Taxation—License Tax—Character of Tax That May Be Levied.— A license tax may be regulated on an ad valorem basis on the volume of business done or it may be a fixed sum levied for carrying on the business.

13. Taxation—Property Tax Authorized by Section 171 of the Constitution Must be Uniform.—Section 171 of the Constitution as amended only provides for a property or ad valorem tax and this tax must be uniform upon all the property subject to the tax.

14. Taxation   Classification of Property—Uniform Property Tax.—If property is classified under section 171 of the Constitution only a uniform property tax can be levied on the property embraced in the class.

15. Taxation—License Tax Cannot Be Substituted for Property Tax.— A license tax for engaging in a business, trade or profession cannot be imposed in lieu of a property tax but it may be imposed in addition to the property tax.

16. Taxation—Oil Leases—Assessment of for Taxation.—Where the same person owns several oil leases each should be assessed for taxation separately from the others.

17. Taxation—Oil Leases—Exemption of Producing Wells.—In ascertaining the value of an oil lease for taxation the value of producing wells on the premises should be excluded.

18. Taxation—Assessment of Oil Leases—Exemption of Producing Wells.—Whether it is allowable in fixing the value of an oil lease to exempt in connection with the well five acres of land adjoining or any number of acres is a question not decided.

EDWARD C. O'REAR, B. B. JOUETT, J. C. JONES, PENDLETON & BUSH and J. T. METCALF for appellant.

CHARLES H. MORRIS, Attorney General, M. M. LOGAN, R. V. GARRED, CLARENCE MILLER and JOHN T. WALKER for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL— Reversing.

A number of legal questions are presented in this appeal, which comes up from a judgment of the Estill circuit court assessing for taxation certain oil leases owned by the appellant, Raydure.

The case was first appealed by Raydure from the decision of the board of supervisors of Estill county, to the quarterly court of the county, and from that court to the circuit court. In the quarterly court the record consisted of an agreed statement of facts and on this agreed statement the case was heard and disposed of in the quarterly court as well as the circuit court. This statement sets out that "the following is stated and adjudged to be the facts and all of the facts relevant to this appeal, and shall be treated and considered as the evidence and all of the evidence introduced and heard upon this appeal the same as if taken by the testimony of witnesses introduced in open court.

"The appellant, W. S. Raydure, is a resident of the state of Ohio, and a non-resident of Kentucky, and of Estill county, and at the time of assessment made by

the board of supervisors of Estill county, Kentucky, appeared before said board and under oath listed and gave in for assessment the following property, to-wit: Oil and gas leases covering twelve hundred and seventy-two (1272) acres of land in Estill county, made up as follows:

1.    Tilford McIntosh lease of 100 acres, upon which have been drilled 12 producing wells.

2.    Mapel lease of 173 acres, upon which have been drilled 33 producing wells.

3.    T. B. McIntosh lease of 300 acres, upon which have been drilled 15 producing wells.

4.    Ed Ginter lease of 55 acres, upon which 1 producing well was drilled and one dry hole.

5.    Berry Abner lease of 100 acres, upon which have been drilled 7 producing wells and 1 dry hole.

6.    W. J. Crow lease of 40 acres, upon which have been drilled 12 producing wells.

7.    John Puckett lease of 200 acres, upon which have been drilled 7 producing wells and 2 dry holes.

8.    Charles Tipton lease of 105 acres, upon which have been drilled 24 producing wells.

Making a total of 1272 acres.

"The said appellant, Raydure, did not list these oil or gas leases voluntarily but under protest, contending that under the law he was not required to list undeveloped territory.

"He also testified before said board that from his experience and in his judgment all of said leases were fully developed and that he would not develop any of said leases any further, believing that there was no oil under the undrilled portions of same, but it is agreed that it is unknown and cannot be certainly ascertained whether there is any oil under said undeveloped portions of said lands until the same is actually drilled. But the board of supervisors was of the opinion that said undeveloped portion of said leases were very valuable. The appellee, board of supervisors, without hearing further testimony, fixed the assessment upon said property as a whole at the total sum of approximately two hundred and fifty thousand dollars ($250,000.00) on said leases. All of said leases were oil leases and said productions were of oil.

"It further appeared from the testimony of said Raydure that all of said wells were being operated and that the oil was being pumped and transported from said wells and in the process of marketing and same was subject to the direct tax fixed by the laws of Kentucky under the act of the special session of the Kentucky legislature of 1917, being chapter 9, and as amended by chapter 122 of the Acts of 1918.

"The appellee, board of supervisors allowed only five (5) acres of land to each well on the above leases and exempted said five (5) acres from taxation as connected with said wells and made the above assessment of two hundred and fifty thousand dollars ($250,000.00) on all of the above described acreage in excess of five (5) acres allowed for each well.

"And it is agreed that the leases referred to gave to said Raydure the right to enter upon said lands for the purpose of drilling for oil and gas, and if found to remove and market same, and said leases were for the term of five (5) years or so long thereafter as oil or gas is found and produced therefrom in paying quantities, the leasor to be given one-eighth (1/8) of the oil produced therefrom, free of cost, delivered in the pipe lines for market."

It appears from this statement of fact that Raydure is a non-resident of Kentucky and it is one of the contentions of his counsel that the legislature discriminated against non-resident leaseholders of oil leases, and in favor of the resident leaseholders of such leases, by making provision for the assessment and taxation of oil leases held by non-resident owners, without making any provision for the assessment or taxation of such leases when held by a resident owner. Or in other words that the legislature attempted, in the legislation presently to be noticed, to assess for taxation all oil leases held and owned by non-residents, while exempting from taxation such leases when held and owned by residents of the state. And if this contention is well founded there can be no doubt that the legislation under which this discrimination was sought to be worked was unlawful, because the legislature of the state has no power to thus discriminate between non-resident and resident holders and owners of oil leases.

The same species or class of property wherever it be situated in this state and whether it be owned by res-

idents or non-residents of the state must be subjected to the same rate of taxation. Neither the state nor local taxing authorities have any discretion - to exercise in respect to the assessment and taxation of the same species or class of property. If the property of a resident owner is exempt from assessment and taxation like property owned by the non-resident must also be exempt. This principle of uniformity and equality is so clearly declared in section 171 of the Constitution as amended that further citation of authority would seem unnecessary. This section in part provides that taxes "shall be uniform upon all property of the same class subject to taxation within the territorial limits of the authority levying the tax." Hager, State Auditor v. Walker, 128 Ky. 1.

The legislation under which the oil leases of Raydure were assessed was enacted in 1918 and may be found in section 4039, volume 3, of the Kentucky Statutes. It reads in part as follows: "It shall be the duty of all persons owning any real or other property, mineral rights, or standing trees of any kind whatever on the lands of another, or any coal, oil or gas privileges by lease or otherwise, or any interest therein, in this state, other than in the county in which the said owner resides, or if said owner should reside out of the state, to list the property for taxes personally, or by an authorized agent in the county where situated at the same time and in the same manner as is now required by law of resident owners; or to file a descriptive list of the same between the first day of July and the first day of October in each year with the county clerk of the county wherein said property is located, fixing a fair cash value of the same and giving the nearest resident thereto and the number of the magisterial district in which the same is located." This statute, substantially as it is now, was first enacted in 1894 (see 1894 edition of Kentucky Statutes, section 4039), and has been carried as a part of the statute law of the state since.

In its beginning the legislation provided for the filing by the non-resident owner with the clerk of the county court of the county in which the property was situated of a descriptive list, and the purpose of the legislation then and now was to identify the owner of property and secure its assessment when he happened to be a

non-resident of the county in which it was situated, so that the assessing authorities might be able to list in the name of the owner the property, which it would often be difficult to do if the owner did not reside in the county where the property was located. Com. v. Holliday, 98 Ky. 617.

When the property was so listed it could only be subjected to the same rate of taxation imposed on like property owned by resident owners.

Accordingly we think no objection can be found to the legislation merely because it provided a different method for listing for taxation the property of non-resident owners from that provided for the listing of the property of resident owners.

Let us see now if there is or was at the time this case originated any statutory provision for the assessment and taxation of oil or gas leases held and owned by residents of the state or by persons who resided in the county where the lease sought to be taxed had a situs. Going back again to the Kentucky Statutes of 1894, which was the first edition issued following the adoption of the Constitution, and in which the provisions heretofore referred to prescribing the methods of listing for assessment the property, including coal, oil, or gas privileges or leases of non-residents are found, there is a schedule which contains a large number of items of property that should be listed for taxation but neither in it nor subsequent statutes was there any specific item calling for the listing for assessment of "mineral rights, trees, coal, oil or gas privileges or leases;" but there was and is a clause following the items specified, providing for the listing of the "value of all property not mentioned above," and plainly this blanket clause was intended to cover and embrace every species of property not specifically described in the itemized list of property the taxpayer should be inquired of concerning. The legislature evidently knew that there might be other species of property than that particularly set forth in the items, as it would be almost impossible to accurately describe in a schedule every species of property that a taxpayer might own; and so, as we have said, to cover any omissions in the items scheduled, the general clause was inserted.

We also think it too plain for difference of opinion that if the assessing authorities should discover that a taxpayer owned any species of property not specifically described in the schedule that it would be their duty to list it for taxation. For example, if a resident owned a gasoline engine of the cash value of one thousand dollars or standing branded trees of the value of $5,000.00, we take it for granted that no one would contend that this personal property should not be assessed for taxation merely because gasoline engines or standing branded trees were not mentioned in the schedule.

If the rule of construction should obtain that the taxing authorities were limited to the items of property specifically mentioned in the schedule much valuable property clearly subject to assessment might not be assessed because omitted in the schedule although it could not be insisted that the legislature intended to exempt it from taxation.

In short, we have no doubt that section 172 of the Constitution providing that "all property, not exempted from taxation by this Constitution, shall be assessed for taxation at its fair cash value, . . ." and section 4020 of the Kentucky Statutes, enacted in pursuance thereof, providing that "all real and personal estate within this state, . . . shall be subject to taxation unless the same be exempt from taxation by the Constitution, . . . ," confer on the taxing authorities ample power to assess for taxation every character and species of property not exempt that may be found in the state, although it may not be specifically mentioned in the schedule prepared for the guidance of the assessor and taxpayer. Nor do we think it necessary that there should be any other provisions of the statute than the one mentioned conferring this authority, although if express statutory direction were necessary it may be found in that item of the schedule providing for the assessment of the "value of all property not mentioned" in the schedule.

We may therefore pass without further comment the argument that the statute requiring non-residents to list certain species of property is discriminatory because there is no provision authorizing the assessment of like property owned by residents, as there can be under the statute no discrimination of the nature mentioned.

Another contention earnestly pressed on our attention is that a lease granting the privilege of drilling for and producing oil if it can be found on the leased premises is not "property" within the meaning of the word "property," as found in section 172 of the Constitution, until after wells have been drilled and oil has been found on the leased premises. If this position is well taken it would necessarily follow that an oil-lease merely giving the lessee the right to explore for oil on the premises leased would not be assessable for taxation until after explorations had been made and oil located and produced.

We do not, however, find ourselves able to agree with counsel in this argument and will endeavor to state the reasons why. We find in the agreed facts that the leases assessed gave Raydure "the right to enter upon said land for the purpose of drilling for oil and gas and if found to remove and market same, and said leases were for the term of five years, or so long thereafter as oil or gas is found and produced therefrom in paying quantities." It is further conceded that these leases gave to Raydure the exclusive privilege of drilling for oil and gas on the property described in the leases. Now, were these leases property subject to assessment and taxation?

Turning again to section 172 of the Constitution we find that "all property, not exempted from taxation by this Constitution, shall be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair voluntary sale."

In defining the word "property" in its constitutional sense this court, in Commonwealth v. Kentucky Distilleries and Warehouse Company, 143 Ky. 314, quoted with approval from Bouvier's Law Dictionary the following: "The term 'property' embraces every species of valuable right and interest, including real and personal property, easements, franchises and hereditaments." And also the following from an article in 32 Cyc. 648, prepared by the Hon. Shackelford Miller, late of this court, the following: "The term 'property' is a generic term of extensive application; and while strictly speaking, it means only the right which a person has in relation to something, or that dominion or indefinite right of user and disposition which one may lawfully exercise over particular things or objects, it is

frequently used to denote the subject of the property or thing itself, which is owned or in relation to which the right of property exists. In the former sense it extends to every species of valuable right or interest, in either real or personal property, or in easements, franchises, and incorporeal hereditaments, and in the latter to everything which is the subject of ownership, or to which the right of property may legally attach, or in other words every class of acquisitions which a man can own or have an interest in. The term is therefore said to include everything which is the subject of ownership, corporeal in incorporeal, tangible or intangible, visible or invisible, real or personal, choses in action as well as in possession, everything which has an exchangeable value, or which goes to make up one's wealth or estate.''

It will be seen from these definitions, which are abundantly supported by authority, that the word ''property'' is one of the very largest meaning, and in its use in taxing statutes, unless limited by the words of the statute, it covers and embraces everything which is the subject of ownership and has an exchangeable value. But under our constitutional and statutory provisions the word ''property'' may be said to only embrace that character or species of property that has a cash value and may be the subject of barter or sale, but if it is of this class or character it cannot escape taxation. It must, however, be property that has a fair cash value, whatever that cash value may be. If it has no cash value whatever it is not subject to assessment and taxation although it might in a broad sense of the word be something that would fall within the description of property.

And so we think that in determining whether an article or thing is the subject of taxation the constitutional test is—Has it a cash value in some amount? If offered for sale could any bidder be found who would pay a cash price for it in any amount? If so it is subject to assessment. As a general rule there are few articles or things that may be the subject of barter or sale that have not some cash value although it may be but trifling. It may also be true that there are a few articles or things that in a very limited way may be the subject of barter or sale that have no cash value; but articles or things of this character are so rare as to be a negligible quantity in determining what is included in the word ''property'' as found in taxing provisions.

In view of this it would serve no useful purpose to extend this opinion in undertaking to ascertain or describe the few articles or things that might be the subject of barter or sale but that yet have no cash value.

From what has been said it follows that if it should be made to appear by satisfactory evidence that an oil lease granting the exclusive privilege to go upon premises for a definite period of time and explore for oil had no cash value and would not bring anything at a fair voluntary sale, then such a lease would not, of course, be subject to assessment for the simple reason that it had no assessable value. If, on the other hand, such a lease has a cash value in some amount, and this value can be ascertained by offering it for sale, then it should be assessed at its fair cash value estimated at the price it would bring at a fair voluntary sale. This is a question of fact more than law. If the lessee says his oil lease has no value and would not bring anything at a fair voluntary sale, and the assessing authorities say it has a cash value and will bring something at a fair voluntary sale, this disputed issue of fact must be determined as are other disputed issues of fact.

We are unable to perceive any sound reason why an oil lease that may be a subject of barter and sale should not be taxed if it has a cash value and will bring something at a fair voluntary sale. Indeed it would be a deliberate and flagrant violation of the Constitution to hold that an oil lease having a cash value and that could be sold on the open market for cash in some amount at a fair voluntary sale was not assessable property.

Nor is the question an open one in this state. It was before us in Wolf County v. Beckett, 127 Ky. 252. In that case the question was whether certain oil leases held by Beckett and others were subject to assessment. In the circuit court they filed a petition setting out that they held the oil and gas wells by leases but they had no title to the realty covered by the respective leases; that the leases simply gave them a license or privilege to go upon the land and drill and explore for oil and that the oil under the land covered by the leases was realty until severed from the soil, and was not properly assessable against them. The lower court in sustaining this contention held that oil in the ground was a part of the realty and belonged to the owner of the surface until it was

taken from the ground, or until the owner made an absolute deed to the oil under the surface, thus separating it from the realty; and that a lease for a term of years was not such an interest in real estate as required the lessee to pay the taxes on the leased premises.

This court, in reversing the judgment of the lower court, said: "It is contended, however, that property held under lease is not subject to taxation in the hands of the lessee. As a general proposition this is true, but there is a wide difference between an ordinary lease of lands and an oil or gas lease. Under the former, the lessee has only the right to occupy and cultivate the land, and take therefrom the growing crops. At the expiration of his lease, the property is intact. Its condition is substantially the same as it was when he entered upon the land. The property owned by the lessor is not diminished. Its value is practically the same. This is not true, however, of an oil or gas lease. The latter carries with it not only the privilege of going upon the lands for that purpose, but the right to take therefrom during the continuance of the lease such oil or gas as may be found. The title to the oil or gas is vested by the lease in the lessee. It is his property of recognized value. He controls it and disposes of it as his own. Not only is the oil or gas property, but the lease under which it is taken from the ground is property which has substantial value and is the subject of frequent sale." To the same effect is Mt. Sterling Oil and Gas Co. v. Ratliff, Sheriff, 127 Ky. 1.

We find no reason for departing from or modifying the rule announced in this case and therefore hold that an oil lease covering undeveloped territory and that has any cash value for which it could be sold at a fair voluntary sale, may be the subject of assessment and taxation.

But it is further insisted that the oil leases here in question should not be assessed even if they have a cash value and could be sold for cash at a fair voluntary sale because, as said, the oil production tax provided for in section 1 of an act of 1917 that may be found in section 4223c of volume 3, Kentucky Statutes, was intended to and does include the value of the lease on the property from which the oil is produced. This act reads: "Every person, firm, corporation or association producing crude petroleum oil in this state shall, in lieu of all other taxes

on the wells producing said crude petroleum, annually pay a tax equal to 1 per centum of the market value of all crude petroleum so produced, and such tax shall be for state purposes, and, in addition, any county in the state may impose a like tax for road purposes, county purposes or school purposes not to exceed one-half of one per centum of the market value of all crude petroleum produced in such county, and the fiscal court of any county may levy said tax for county purposes and shall determine what fund or funds shall receive the taxes when collected, and, when crude petroleum is produced in any separate taxing district in a county, the fiscal court shall equitably distribute such taxes between the county and such taxing district.''

In other words, the argument rested on this statute is that when a producing well is found by the lessee of an oil lease the tax on the oil produced from the well exempts from further or other taxation the lease not only on the particuar premises that may be said to be included in the well but the remainder of the lease, and of course if this argument is sound the leases here sought to be and that were taxed in the lower court are wholly exempt from taxation although they might have a large value on account of the exclusive privilege conferred by the leases to drill for and produce oil in other parts of the leased premises not reached by the producing wells.

It would also necessarily follow if the position of counsel is well taken that the production tax would be substituted for and take the place of the ad valorem or property tax that we have held the oil leases subject to.

In considering this contention the first question that naturally suggests itself is—Was it the purpose of the legislature, in the enactment of this production tax statute, that the tax imposed should be in lieu of the ad valorem or property tax to which the oil lease covering the producing territory was subject, and if such was the intention of the legislature, did it under the Constitution have the power to provide that a production tax might be in lieu of a property tax to which the property would be subject except for the production tax?

Previous to the amendment of section 171 of the Constitution by the amendment that was adopted in November, 1915, section 171 provided in part that ''taxes shall

be levied and collected for public purposes only. They shall be uniform upon all property subject to taxation within the territorial limits of the authority levying the tax, and all taxes shall be levied and collected by general law." Under this original section it was held, in Levi v. City of Louisville, 97 Ky. 394, that the legislature had no power to substitute a license tax or any other kind of a tax in lieu of the uniform ad valorem property tax or to classify property for taxation.

To escape the effect of this decision section 171 of the Constitution was amended as stated. By the amendment there was inserted in the original section after the words "they shall be uniform upon all property" the words "of the same class;" and there was added to the section these words: "The general assembly shall have power to divide property into classes and to determine what class or classes of property shall be subject to local taxation." It will thus be seen that the only change made by the amendment in the original section that is pertinent to the matter now being considered was that permitting the classification of property and the right to determine what classes should be subject to local taxation. It is further obvious that until a classification of property has been made a uniform tax must be imposed upon all the property subject to taxation within the territorial limits of the authority levying the tax, but if the property within the territorial limits has been divided, as it may be, into classes then a different tax may be imposed upon the property in each class, but it too must be uniform upon the property in that class. There can be no lack of uniformity or discrimination in the imposition of taxes upon property in the same class, and when there has been no classification the strict rule of uniformity obtains now as it did before the amendment.

It was held, as we have seen in the Levi case, that the legislature was prohibited by section 171 of the Constitution from substituting a license tax for an ad valorem tax, and this prohibition was continued by the amendment to section 171. It is no more allowable under the amendment to substitute a license tax for an ad valorem tax than it was before the amendment. The only character of taxes that can be imposed under section 171, either before or since the amendment, is ad valorem or

property taxes. If, by authority of the amendment, property is classified, as it may be, for taxation, the tax that is imposed on the class under this section must be an ad valorem or a property tax. Neither the rule of uniformity nor the nature of the tax was changed in any manner by the amendment. The only change was the authority to classify, but when the classification is made the tax imposed must be an ad valorem or property tax and must be a uniform tax.

The tax provided for in this legislation was a license tax on the business and not a property tax. This is made plain by the title of the act of 1917, which reads: "An act imposing a license or franchise on any person, firm, corporation or association engaged in the production of oil in this state and authorizing counties also to impose such tax . . .; providing methods of determining the amount of tax due. . . .;" and by the title of the act of 1918, which is an amendment of the act of 1917, and recites that it is "An act to amend and re-enact . . . the act . . . of 1917, which act imposes a license or franchise on any person, firm, corporation or association engaged in the production of crude petroleum in this state." Thus showing very plainly the nature and purpose of the act.

Looking now again to the statute taxing the production of oil it seems perfectly plain that the legislature did not intend by this statute to make any classification of property within the meaning of the amendment to section 171 of the Constitution or to provide that the production tax should be in lieu of or a substitute for an ad valorem tax.

The authority for this legislation and for the imposition of this oil production tax is not to be found in section 171 of the Constitution. In that section there is no warrant for a production tax or any other than the ordinary ad valorem tax, and so we must turn to other sections of the Constitution to find authority for this oil production tax statute and such authority is to be found in section 181, reading in part: "The general assembly may, by general laws only, provide for the payment of license fees on franchises, stock used for breeding purposes, the various trades, occupations and professions, or a special or excise tax." Under this section, taxes of the kind described may be levied not as a substitute

for but in addition to the ad valorem tax provided for by section 171.

Under this section the legislature may provide, for example, that the merchant who pays an ad valorem tax on all his property, may be required in addition thereto to pay a license tax for the privilege of engaging in the trade or occupation of a merchant; and so the lawyer, who pays an ad valorem tax on his library and office furniture, may be required to pay in addition thereto a license tax for the privilege of engaging in the pursuits of his profession. Likewise, the blacksmith, who pays a property tax on his shop and all the tools and implements necessary to carry on his trade, may be required, in addition thereto, to pay a license tax for the privilege of carrying on his trade.

In numerous cases under it license taxes on trades, occupations and professions have been upheld, but in no one of them was it so much as intimated that the license tax could take the place of the ad valorem tax. Elliott v. City of Louisville, 101 Ky. 262; Hager v. Walker, 128 Ky. 1; Payne v. Medicine Co., 138 Ky. 164; City of Louisville v. Sagalooski, 136 Ky. 324; Gordon v. City of Louisville, 138 Ky. 442.

As we have endeavored to show, the legislature of 1917 did not and could not if it had so desired enact that the oil production tax should be in lieu of or as a substitute for an ad valorem tax on any species of property. The act itself is not susceptible of this construction, but if it were, and could not be interpreted to have any other meaning, it would necessarily be in conflict with section 171 of the Constitution and therefore void.

The validity of this statute, however, and the tax imposed by it may be upheld under section 181 of the Constitution as a license tax on the business of engaging in the production of oil. It cannot be sustained on any other ground. It may be true, as argued by counsel, that this construction has the effect of imposing a double tax on the owner of an oil lease who is also the owner of an oil producing well on the leased territory, as his oil lease is subject to an ad valorem tax and the oil he produces to this license production tax; but so is the lawyer who pays a license to practice his profession and in addition a property tax on the material used in the pursuit of his profession subjected to a double tax. So, too, is the

doctor, the blacksmith, the merchant and every person who is engaged in a trade, occupation or profession on which there is imposed a license tax, and who must also pay a property tax on the property with which he carries on his business.

The legislature might have specified a fixed sum that every person producing oil should pay, or it might have provided some other reasonable and uniform method of exacting from persons engaged in the oil business a license fee for each producing well; but in place of doing this it adopted the method of imposing a license fee graduated by the quantity of oil produced, and this would appear to be a reasonable and uniform method of fixing the license fee.

It was clearly within the power of the legislature to fix a reasonable license tax to be determined by the volume of oil produced. There is no conflict in the authorities on this subject. The question was before this court in Strater Bros. Tobacco Co. v. Commonwealth, 117 Ky. 604. In that case a graded license tax was put by the statute upon manufacturers of tobacco based on the value of the product. In contesting the validity of this tax the tobacco company contended that it was a tax upon the manufactured product and not on the right or privilege to conduct the business and therefore being a property tax imposed under section 171 of the Constitution it was in violation thereof because not uniform. For the Commonwealth the argument was made that the tax was a license or occupation tax and not a tax upon the product.

In considering these conflicting views the court, after referring to section 181 of the Constitution, said: "The tax imposed is not levied upon property. It is simply a license tax as declared by the general assembly in the act. The Constitution not only does not prohibit the imposition of such a tax, but it expressly recognizes the right of the legislature to impose it. It not only does so, but authorizes it to be done in addition to an ad valorem tax. If the Constitution had been silent upon the question, it would have been competent for the legislature to have enacted the law." It further said: "We do not think the tax is lacking in the quality of uniformity. It is the same on each person or corporation which manufactures the same quantity of tobacco. The legislature had the right to impose a graduated license tax. The

larger manufacturer is required to pay more than the smaller one, based upon the value of the product manufactured. If all manufacturers of tobacco, regardless of the manufactured product produced by each, had been made to pay the same license tax, then a more potential argument could be made against the validity of the law for lack of uniformity and inequality of burden than has been made against the law here sought to be enforced. While this is true, we would not hold it sound. If we did, then it would logically follow that a license tax on retail liquor dealers would be invalid, because the one who sold a small quantity of liquor paid the same as the one who sold many times as much. This court has upheld ordinances imposing license or occupation tax on liverymen based upon the number of vehicles employed in their business. Such taxes are not based upon the value of the vehicles or the profit derived from their use, but upon the number employed."

The doctrine of this case was approved in Brown-Foreman Co. v. Commonwealth, 125 Ky. 402, and this case was affirmed by the Supreme Court of the United States in Brown-Foreman Company v. Kentucky, 217 U. S. 563, 54 Law Ed. 883. See further Clark v. City of Titusville, 184 U. S. 329, 46 Law Ed. 569; Salt Lake City v. Christensen Co., 34 Utah 38, 17 L. R. A. (N. S.) 898, and the cases cited in the notes; Gordon v. City of Louisville, 138 Ky. 442.

In Commonwealth v. Allen Coal Co., 251 Penn. 134, L. R. A. (1916F) 154, the court found no objection to the fact that the act in question provided for a tax on the value of each ton of anthracite coal produced, but it was held invalid upon the ground that bituminous coal was exempt from its operation. A like tax was approved by the Supreme Court of the United States in Choctaw R. Co. v. Harrison, 235 U. S. 292, 59 Law Ed. 734 (?). Another instructive case on the subject is In Re Gross Production Tax of Wolverine Oil Co., Okla. 153 Pac. Rep. 362.

There being no contention that this act is either discriminatory or unreasonable there is no room to doubt that the imposition of this tax as a license tax on the privilege of producing oil was authorized by section 181 of the Constitution; nor is there any authority to be found holding that it is not competent for the legislature

to impose a license tax for the privilege of doing business in addition to the ad valorem tax that may be imposed upon the property engaged in the business.

The case of Cumberland Tel. & Tel. Co. v. Hopkins, 121 Ky. 850, is not in conflict with this view. In that case a license tax sought to be imposed for the privilege of conducting the telephone business in the city of Eminence was held invalid upon the sole ground that the company had theretofore for a valuable consideration obtained from the city the privilege to conduct its business. Therefore the imposition of an additional tax on the same privilege would be double taxation.

It follows from what has been said that the production tax on the oil produced is separate and distinct from the ad valorem tax to which the leases are subject and cannot operate to exempt them from the property tax.

It will be noticed that according to the agreed state of facts the taxing authorities of Estill county in determining the value of the leases excluded from the territory covered by the wells five acres surrounding each producing well and only estimated the value of the leases as covering the remainder of the leased premises. Whether the board of supervisors had the authority under the statute to make this exemption of five acres or any number of acres, or whether more acreage should be exempted we do not feel called on to determine in this case, as it does not appear from the agreed state of facts that Raydure is complaining of the action of the board in exempting five acres surrounding each well.

The board of supervisors, after taking out the exemption of five acres, appear to have assessed the eight leases, treating them as a whole or as one lease, of the value of two hundred and fifty thousand dollars. Under our view of the law each lease was a separate, distinct piece of property and the value of each should have been fixed by the board of supervisors without respect to the value of any other; and prejudicial error was committed against Raydure in this respect.

On a return of the case the court should hear evidence and find the fair cash value of each lease, excluding the value of each producing well thereon, estimated at the price it would bring at a fair voluntary sale and then assess it. The quantity of land that should be ex-

cluded in connection with each well we express no opinion concerning.

Wherefore the judgment is reversed with directions to proceed in conformity with this opinion. .