## Burley Tobacco Growers' Co-operative Association v. City of Carrollton.

(Decided March 27, 1925.)

### Appeal from Carroll Circuit Court.

1.  Crops—Annual Crops Personalty.—Grasses, fruits, and perennial crops are considered part of realty, but annual crops as personalty.

2.  Execution—Growing Crops Subject to Levy and Sale Under Execution, though Under Statute Exempt from Seizure Prior to October 1st.—Growing crops are subject to levy and sale under execution, though under Ky. Stats., section 1699, they pass with realty on execution sale and are exempt from seizure prior to October 1st, unless severed.

3.  Taxation—Growing Crops Taxable Unless Exempted as Under Constitution.—Growing crops, whether regarded as realty or personalty, are taxable, unless exempted as under Constitution, section 170, and Ky. Stats., section 4026.

4.  Taxation—Tobacco Crops "Grown" in Given "Year" Held Taxable by Assessment Made Following April.—Under Constitution, sec-

tion 170, and Ky. Stats., section 4026, exempting from taxation "crops grown in the year in which the assessment was made," and in view of section 452, and Bingham Co-operative Marketing Act, section 21, tobacco grown in a given year is taxable by assessment made the following April; "grown" being used in the sense of "raised," and "year" meaning the calendar year.

5. Taxation—Provision for Taxation of Shares of Stock of Co-operative Marketing Corporations in Lieu of Tax on Property Owned by Such Corporation Held Invalid.—Bingham Co-operative Marketing Act, section 31, providing for taxation of shares of corporations organized thereunder in lieu of taxation of property in the name of said association, held invalid under Constitution, sections 171, 172, and 174, requiring uniformity of taxation.

6. Taxation—Legislature May Indicate Method of Assessment and Fix Liability as Between Two or More Interested Persons.— Legislature may provide method of assessment of taxes and indicate which of two or more interested parties shall be liable for payment of taxes.

ROBT. H. HAYS, WORTHINGTON, BROWNING & REED, J. A. DONALDSON & SONS and AARON SAPIRO for appellant.

WINSLOW & HOWE and T. W. BATES for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

Appellant, Burley Tobacco Growers' Co-operative Association, was organized under an act of the General Assembly approved January 10, 1922, and known as the Bingham Co-operative Marketing Act.

On April 1, 1922, it had stored in its warehouses in Carrollton 579 hogsheads of tobacco which was raised in the year 1921, and which it had received from its members under its standard contract.

Carrollton is a city of the fourth class, and in accordance with the provisions of section 3535, Kentucky Statutes, regulating assessment in such cities its officers assessed this property and are undertaking to collect the city taxes due thereon. In this suit an injunction is sought to prevent them from so doing. A demurrer was sustained to the petition and it was dismissed. The association has appealed. The allegations of fact in the petition will be treated as facts without quoting directly from the pleading.

It is urged first that at the date of assessment this tobacco as owned and held was exempt from taxation by virtue of section 170 of the Constitution and section

4026, Kentucky Statutes, and section 21 of the Bingham act, to-wit:

"There shall be exempt from taxation . . . crops grown in the year in which the assessment is made and in the hands of the producer, . . . " Con. sec. 170.

Section 4026 is a statutory repetition of the constitutional provision, *supra.*

Section 21 of the Bingham Act provides:

"Any exemptions under any and all existing laws applying to agricultural products in the possession or under the control of the individual producer shall apply similarly and completely to such products delivered by its former members in the possession or under the control of the association."

The constitutional question falls under two divisions: First, under an assessment of April 1, 1922, is tobacco grown in the year 1921 to be classed "as grown" in the year in which the assessment is made? Second, is tobacco that has been received from a member under the standard contract and is being held by the association for marketing purposes still "in the hands of the producer" in the constitutional sense?

Considering these questions in their order: As a year is a taxing unit, it is manifest that it was the intention of the convention to grant immunity from taxation for that period; and as the section applies to crops generally, and these grow and mature at different periods, it is evident that the word year refers to 365 consecutive days. Ordinarily this would mean a calendar year (Kentucky Statutes, section 452). This section was in effect prior to the adoption of the present Constitution and it is claimed the convention had it in mind. If so, the phrase "in the year of the assessment" would perhaps refer to the twelve months ending with and including the day of the assessment. Appellant adopts this view.

The argument is that crops until severed from the soil are a part of the realty and therefore not taxable; that as the convention intended to exempt such crops from taxation for a year it naturally menat for a year from the time their taxable status was fixed and, therefore, the word "grown" represents the matured, severed crops. Thus construed "crops grown in the year of the

assessment" would mean crops severed from the soil within twelve months previous to the date of the assessment.

This argument is ingenious, but not convincing. Grasses, fruits and perennial crops are considered a part of the realty, but annual crops are generally regarded as personalty. 8 R. C. L., pages 356-357.

In this state growing crops are subject to levy and sale under execution. Thompson v. Craigmyle, 4 B. M. 391, though by statute they are exempt from such seizure prior to October 1, unless severed, and pass with the realty under execution sale of the latter. Section 1696, Kentucky Statutes.

But whether regarded as realty or personalty as a general rule growing crops are taxable. Cooley on Taxation, sections 561-725.

In our former Constitutions there were no provisions relating to revenue and taxation, but recognizing the principle that ordinarily growing crops were taxable it became the legislative policy to exempt such crops.

By the act of ——, Bullitt & Feland, 1879 Statutes, page 709, chapter 92, section 3, "the growing crop on land listed for taxation" was exempted.

By the act of May, 1886, Bullitt & Feland, 1888 Statutes, page 1036, chapter 92, section 9, this section was extended to include severed crops by exempting from taxation " . . . all crops that were raised in the year in which the assessment is made. . . . " This was the law at the time the convention met and it was substantially embodied in the Constitution, with the addition of the words "and in the hands of the producer."

Naturally, the word "grown" in the Constitution is used in the sense of the word "raised" in the former statute, and it can hardly be argued that crops "are raised" in the year after they are severed from the soil.

It is well known that tobacco is not severed until late summer or early fall. If such a crop raised in the year 1921 is not assessable by the city on April 1, 1922, or by the state on July 1, 1922, because "grown" within one year prior to that date, it could be held without taxation until the day before the assessment date of 1923, and thus be exempt for practically two years. This would be out of harmony with the other sections of the Constitution requiring uniformity in taxation, and we do not think the convention so intended; hence the reference

must be either to the fiscal year or to the numerical calendar year in which the crop was *grown—raised*.

In this respect it will be observed that the state and municipalities have different dates for assessment and that crops mature in different seasons. It was not contemplated that the grower should keep books on this question. While some crops are sown in the fall and remain in the ground during the winter, the principal growth and maturity of all crops are in the spring, summer and fall. The cropping season is commonly regarded as synonymous with *the* calendar year beginning January 1st; in other words, the numerical calendar year.

Agricultural leases and rent contracts are usually and customarily made with reference to it, and such year is commonly understood when the word "year" is used, while the fiscal year is seldom considered aside from fiscal business.

The convention knew of the popular definition of the word, and for the various reasons we have suggested we conclude that by the words used it meant to exempt from taxation crops grown during such calendar year in which the assessment is made. It follows that tobacco grown in the year 1921 and in the hands of the producer may be assessed at any assessing date during the year 1922. In this view of the case it is unnecessary to determine whether or not the tobacco in question was in the hands of the producer at the time of the assessment.

It is next urged that this tobacco is assessable against the shareholders or members and not against the association. Section six of the articles of incorporation provides:

"The Burley Tobacco Growers' Co-operative Association shall not have any capital stock, but shall admit members into the association upon the payment of an entrance fee of five ($5.00) dollars and other uniform conditions.

"The voting power of the members of this association shall be equal, and each member shall have one vote only.

"The property rights and interests of each member shall be equal, and each member shall have one unit of property rights only."

Each member signs a marketing agreement which requires him to sell and deliver to the association all the

tobacco grown by him during the period of the contract, and upon paying the entrance fee is given a nontransferable membership certificate, reading:

"This certifies that ........................ is a member of the Burley Tobacco Growers' Co-operative Association, and that he has executed the standard application for membership and the agreements thereof, and that he is doing his share to abolish speculation and waste and to stabilize the tobacco markets in the interest of the growers of tobacco and for the betterment of his county and his state."

In addition, upon delivery of the tobacco to the association, participation receipts are issued to members representing the interest of the member in the proceeds of the pool above the amount of the cash advance then paid him.

Section 17 of the Bingham Act provides: "If they (the growers) contract a sale to the association, it shall be conclusively held that the title to the products passes absolutely and unreservedly except for recorded liens to the association upon delivery."

Section 6 of the marketing contract gives to the association discretion as to the cost of maintenance, handling and marketing such tobacco and provides for the payment of the surplus *pro rata* among the respective growers of each year on the basis of their deliveries.

Section 31 of the Bingham Act provides as follows:

"The shares of corporations organized under this act shall be taxable against the owner thereof of the period of assessment of other personal property for taxation in this state.

"Such shares will represent in the aggregate, all the property held or owned by such corporation, and when taxed as against the individual owner, all of the property in the name of said association will thereby be taxed.

"Under existing law, crops grown in the year of assessment are exempt from tax whilst owned by the producer. So much of the value of each share of said stock as may represent the owners' proportion of crops grown by him and delivered to the association as herein provided, shall be exempt from taxation, inasmuch as it is the same thing exempted now by the Constitution and laws of this state to such grower."

It is argued that by this act the legislature has provided a method of assessing property owned and held by the co-operative association whereby the property is assessed against the grower and the tax paid by him, and the corporation relieved of both.

We recognize the right of the legislature to provide a method of assessment and to indicate which of two or more interested parties shall be liable for the payment of taxes.

In this state, at one time, subject to certain exceptions, the shares of corporations were assessed against the owner instead of taxing the corporate property and this legislation was upheld.  L. & E. Mail Co. v. Barbour, 88 Ky. 73.  In 1884 this was changed by an act providing for a direct tax upon the corporate property.  This was also upheld.  Whittaker v. Brooks, 90 Ky. 68.

On the familiar question of bank deposits it has been held that payment of the tax by the depositor relieves the bank from liability thereon, though the bank admittedly has a qualified interest in the deposit.  Commonwealth v. Bank of Commerce, 118 Ky. 547.

The same principle is applied as to railroad property.  Railroad Taxes v. Commonwealth of Kentucky, 5 Rep. 445, and to the assessment of oil properties.  Raydure v. Board of Supervisors, &c., 183 Ky. 84, and of distilled spirits in bonded warehouses.  Commonwealth v. E. H. Taylor, Jr., Co., 101 Ky. 325.

However, in the exercise of this right the legislature cannot destroy the uniformity of taxation required by sections 171, 172 and 174 of the Constitution or add to the exemptions allowed by section 170 of that instrument, and a decision of this case must turn upon whether or not section 31, *supra,* has that effect.

It is unnecessary to draw a distinction between the meaning of the words "shares in the association" or "membership certificates," nor is it necessary to draw a distinction between profit-sharing and nonprofit-sharing corporations.

We may assume without deciding that the naked legal title is placed in the association for marketing purposes only and that in reality it is acting in the capacity of a trustee for its members, yet this would not relieve the corporate property from taxation.

Under its charter and the marketing agreement shown above the association is authorized to incur all necessary expenses in holding and marketing, and this together with the absolute legal title and full control of the article, certainly includes liability for taxation.

Of course, as indicated, it might be relieved of this burden by placing such upon the members; but is this result obtained by the act quoted? There are 107,000 members; each is restricted to the ownership of one nontransferable membership certificate of the nominal value of $5.00, making a total of $535,000.00, while the association in purchasing and holding different crops may have on hand tens of millions of dollars' worth of tobacco. Certainly it cannot be said that these immense values are represented by the comparatively small values of the certificates. If such representation could be had, upon what basis would it be placed? Each of these certificates is of equal value, but it cannot be assessed and the tax collected from each member upon the basis of equality in the ownership of the certificates.

If so, a member who had delivered one acre of tobacco would be on the same footing with one who had delivered one thousand acres. In the payment of taxes this would be to the interest of the large grower, but a division of assets on this basis would prove disastrous to him. On the other hand, the small grower would be bankrupted in the payment of taxes, but would reach a socialistic Utopia in the final division. Seriously speaking, the provisions of section 31, *supra,* that "such shares will represent in the aggregate all the property held or owned by such corporation and when taxed against the individual owner all the property of said association will thereby be taxed," is inaccurate and fallacious.

Reference is made to the fact that upon the delivery of his tobacco to the association the member is advanced a cash payment, presumably a third of its value, and given a participation receipt for the remainder. The receipt represents his actual interest in the crops held by the association. It is something tangible with a potential value, but no reference is made in the statute to its assessment. If it had been, the aggregate of these receipts would have represented only two-thirds of the crop received, hence it could not have been accepted in lieu of corporate taxation. So that, whichever way it is viewed, this property has not been assessed against the shareholders or members.

Indeed, as a practical matter, it is difficult to perceive how an association member could make an accurate assessment of his interest in such property.

His tobacco is received, classified, graded and commingled with that of others. He has no way of determining how much of any particular grade is received or sold from time to time, or how much of all of any one or more classes is on hand at any particular date, nor is he advised as to the value of any class or grade, so that it would be impractical for 107,000 members to make separate lists of their supposed interest in an unknown quantity of tobacco of unknown value.

This suit presents its inapplicability from a different angle.    Here the total tax is $220.13, or about two mills per member.  On an equality basis it would require the taxes from ten members to purchase one two-cent postage stamp, and, even if the taxing authorities knew their names and addresses an assessment would be out of the question.  Unquestionably this would be prohibitive and prevent assessment or collection of municipal taxes.

Without emphasizing this phase and aside from municipal taxation, it is manifest that under the guise of regulating assessments the act practically exempts all products held by the association from all taxation.

Subject to the exemptions enumerated in section 170 of the Constitution and to the right of classification provided in section 171, a matter not here in issue, sections 171, 172 and 174 of that instrument provide for a uniform tax to be levied, assessed and collected on all property. These provisions may not be impinged, either directly or indirectly, and any legislative act having that effect is necessarily invalid.

Having reached the conclusion that section 31 of the Bingham Act is invalid for the reasons set out, it is unnecessary to consider the other grounds of invalidity urged against it.

Wherefore, perceiving no error, the judgment is affirmed.

Whole court sitting.