### Swiss Oil Corporation v. Shanks, Auditor.

(Decided March 20, 1925.)

## Appeal from Franklin Circuit Court.

1. Licenses—Auditor Cannot Issue Warrant for Refund of Taxes on Behalf of Oil Producers at Suit of One.—In action by oil producer for refund of taxes collected under Ky. Stats., section 4223c-1, from plaintiff and all other oil producers, auditor could not issue warrant in behalf of any except plaintiff, in view of sections 162, 163, authorizing refund "to person who paid same," but not unless application be made "in each case" within two years from time of payment, since claims of different producers are separate and individual, and not of such character as to allow suit by one for benefit of all under Civil Code of Practice, section 254.

2. Courts—Former Decisions as to Constitutionality of Tax Not Dicta.—Former decisions as to constitutionality of statute imposing tax, where question arose on claimed exemptions from other taxes on basis of tax so imposed, held not mere dicta, because decision of another question presented would have been controlling of cases.

3. Courts—Rule when Determination of One of Several Questions Constitutes Dicta Stated.—Two or more questions properly arising in case under pleading and proof may be determined, and neither can be regarded as dicta, though either would have disposed of entire case upon its merits, without other, nor can additional reason for decision, brought forward after case has been disposed of on one ground, be regarded as dicta.

4. Courts—Decision Giving Act Such Construction as to Make it Valid will Not be Overruled.—Decision, adopting construction

rendering Ky. Stats., section 4223c-1, imposing occupation tax on business of producing oil valid, which was accepted for more than five years as conclusive adjudication on question, oil producers at two subsequent sessions of legislature having attempted without success to procure modification by legislature of effect of that decision, will not be overruled merely because construction of legislative meaning may be doubtful.

5. Courts—Construction of Act Sustained on Basis of Stare Decisis. —Where statute imposing tax had been twice construed and declared constitutional, and state finances in business of oil producers had been adjusted thereto, and where two subsequent legislatures had tacitly approved construction by refusing to modify it, construction will be sustained.

6. Statutes—Constitutional Defects in Amendment to Tax Statute Not Material as Respects Refund of Taxes Paid Thereunder.— Where Ky. Stats., section 4223c-1, being Act 1917 as amended by Act 1918, imposing occupational tax on business of producing oil in state, was alleged to violate Constitution, section 51, and federal Constitution as imposing burden on interstate commerce and violating the Fourteenth Amendment, such defects held not material as regards taxes paid under amendment, since alleged defects were in amendment only, which was merely re-enactment of original act, with some administrative features changed, so that, if destroyed, would leave original act in force.

E. L. McDONALD and O'REAR, FOWLER & WALLACE for aplant.

FRANK E. DAUGHERTY, Attorney General, and CHAS. CREAL, Assistant Attorney General, for appellee.

ROBT. H. WINN and J. P. HARRISON, Amici Curiae.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming on the direct and reversing on the cross appeal.

By this action the Swiss Oil Corporation attacks the validity of section 4223c-1 of the Kentucky Statutes, which imposes a tax upon oil producers, and seeks to recover $8,944.64 paid by it to the state thereunder, and also to require the auditor to make similar refunds to all other producers of like taxes paid by them.

The lower court refused to permit plaintiff to sue for and on behalf of the other oil producers, but held the act void, and awarded plaintiff a judgment requiring the auditor to issue to it a warrant for the amount paid by it. Complaining of so much of the judgment as refused to permit it to sue for and on behalf of other oil producers, plaintiff prosecuted this appeal, and the auditor has

cross-appealed from that part of the judgment holding the act invalid and ordering a refund of the $8,944.64.

The single question presented by the direct appeal may be disposed of very briefly. Section 162 of the statutes empowers the auditor to issue his warrant on the treasury for taxes improperly paid, "in behalf of the person who paid the same." Section 163 provides he shall not issue his warrant for any money improperly paid for taxes "unless application be made *in each case* within two years from the time when such payment was made."

Hence it is clear that the auditor cannot issue his warrant for a refund of taxes improperly paid unless and until application is made therefor "in each case," and "in behalf of the person who paid the same." This necessarily implies, as reason dictates, that the application for a refund must be made by the party entitled thereto, or some one authorized by him to make such demand, and that each claim shall be made separately.

It is, therefore, clear that the demand made by the plaintiff upon the auditor for the aggregate claimed to be due it and others for whom it had no authority to act, was not such a demand as the statute contemplates.

Then again, the claims of the different producers for refund of taxes paid by them are necessarily separate and individual, and not of such character as that one of them may sue for the benefit of all under section 254 of the Code of Practice, and by reason of which appellant claims the right so to do. This question is conclusively settled against the appellant in Union Light & Power Co. v. Mulligan, 177 Ky. 670, 197 S. W. 1081; Batman v. Louisville Gas & Electric Co., 187 Ky. 659, 220 S. W. 318; Barriger v. Louisville Gas & Electric Co., 196 Ky. 268, 244 S. W. 690, and upon authority of those cases, the judgment upon the direct appeal is affirmed.

Section 4223c-1 of the statutes, under which the taxes that appellant seeks to compel the auditor to refund were laid and collected, is an act of the 1917 session of the legislature, as amended at the 1918 session. As thus amended it was construed and declared valid by this court in Raydure v. Board of Supervisors, 183 Ky. 84, 209 S. W. 19, and again in Associated Producers Co. v. Supervisors, 202 Ky. 538, 260 S. W. 335.

It is insisted, however, for appellant that the question of the act's validity was not present in either case, and that these declarations of validity are therefore

dicta and not controlling. Whether or not this is true is the first question for decision on the cross-appeal.

In the Raydure case, the board of supervisors assessed for *ad valorem* taxation several oil leases owned by him, except five acres surrounding each producing well. He contested their right to do so upon three grounds, namely: (1) That oil leases are not property within the meaning of our taxing laws, (2) if so, their assessment against him, a nonresident, was discriminative and illegal because there was no provision for taxing same in the hands of a resident of the state, and (3) that his liability for a produciton tax on his producing wells, under section 4223c-1, *supra*, exempted him from liability for any tax of any and all kinds upon the leases upon which these producing wells were located.

This latter contention, presented not only by brief of counsel and upon the oral argument, but also by the agreed statement of facts upon which the case was tried in the courts below, clearly tendered to this court for decision both the validity and the meaning of the act levying the so-called production tax, since obviously unless that act was valid and actually allowed the claimed exemption, appellant's contention was unsound. So, after deciding that there was no merit in either of Raydure's first two contentions, the court took up section 4223c-1, considered its validity under sections 171 and 181 of the state Constitution, which involved the character of the tax it imposed, and whether or not it did in fact, as claimed by Raydure, exempt his leases from assessment for *ad valorem* taxes.

More than six printed pages—nearly half of the opinion—are devoted to a discussion as to the validity and meaning of that section of the statutes. Many opinions pertinent to those questions, from this and other courts, were reviewed, and, after a most careful consideration of both questions, from every possible angle, the conclusion was reached that while the act was valid, as contended by the appellant, it did not grant the claimed exemption, although it provided that the payment of the tax thereby imposed should be "in lieu of all other taxes on wells producing said crude petroleum."

If the court had stopped here, surely no one would ever have thought of calling its decision of either of these questions *obiter*. But the court went farther and also held that if the provisions quoted above were construed to grant an exemption from *ad valorem* taxes, it

would render the whole act violative of section 171 of the Constitution, and void.

By having decided not only that the act did not grant the claimed exemption, but also that if it did it would have been unconstitutional, it is now apparent that the court need not have decided the question of the validity of the act, and it is solely because the court did not waive that question that it is now insisted its decision thereof is *dictum*. Despite some apparent plausibility, this contention is, we feel sure, wholly unsound.

While statements made in an opinion that are not necessary to the decision of the question under consideration by the court are *dicta*, it does not follow by any means, and is not true, that the decision of either of two questions, presented by the record and in the arguments, is *obiter* simply because a decision of one of them disposed of the case and rendered a decision of the other unnecessary.

Despite some conflict in the authorities as to what is and what is not *dictum* in other circumstances, the rule is well settled, upon both reason and authority, that:

"Two or more questions properly arising in a case under the pleadings and proof may be determined, though either one would have disposed of the entire case upon its merits without the other, and neither holding is a *dictum* so long as it is properly raised and determined. Nor can an additional reason for a decision, brought forward after the case has been disposed of on one ground, be regarded as *dictum*." 7 R. C. L. 1005; King v. Pauly, 159 Cal. 549, 115 Pac. 210, Ann. Cas. 1912C, 1244 and note; McFarland v. Bush, 94 Tenn. 538, 29 S. W. 899, 45 A. S. R. 760, 27 L. R. A. 662; Chicago B. & Q. R. Co. v. Appanoose Co., 104 C. C. A. 573, 31 L. R. A. (N. S.) 1117.

It results, therefore, that the decisions in the Raydure case, that the act of 1917 as amended in 1918 is a license and not a property tax, and as such a valid exercise of legislative authority conferred by section 181 of the state Constitution, are not *dicta* but authoritative decisions of the court, and binding unless and until overruled.

The Associated Producers Company, in its case, claimed an exemption from *ad valorem* tax on the five acres surrounding each producing well, under section

4223c-1, *supra,* as construed in the Raydure case. As the opinion in the Raydure case had expressly refrained from deciding whether or not section 4223c-1 exempted five acres of land around a producing well for the reason that that question was not presented by the record, it was manifest that it was not intended that that question should be concluded or affected by anything said therein.

It necessarily resulted, therefore, that the particular statement therein upon which the Associated Producers Company's claim of exemption was based did not and could not support its claim, and the court had no trouble in reaching that conclusion, and that statement was withdrawn. It then became necessary, just as in the Raydure case, to decide whether or not the act itself granted the claimed exemption, and in disposing of that question the validity and meaning of the act were reconsidered by the whole court, and the conclusion again reached, as in the Raydure case, that it was valid under section 181 of the Constitution because it was a license upon the business of producing oil in the state, and that the provision therein that such tax should be "in lieu of all other taxes on the wells producing said crude petroleum" was intended to mean, and means, that there would be no other license or occupation tax thereon.

Judge Clay, who had not participated in the decision of the Raydure case, dissented, not because he did not agree with the conclusion of either case, but because, from a consideration of the history of the legislation, he did not believe that the act would have been passed by the legislature as construed by the court in both cases, and that it was, for that reason, unconstitutional.

It follows that the court's decision in that case, that the act is valid—as well as the reasons upon which that conclusion is rested—is not *dictum,* for the same reasons that the like decisions in the Raydure case were not of that character.

It is, therefore, clear that the court has twice had presented to it for decision, and each time, after the most careful consideration, has decided the act in question valid, and that it did not exempt from *ad valorem* taxes the whole or any part of an oil lease, and imposed only a license or occupational tax upon the business of producing oil in this state.

In addition, both state officials and oil producers recognized the Raydure case, for more than five years

and until the institution of this action, as a conclusive adjudication by this court that section 4223c-1 was valid, and that it, at least, did not exempt the whole, if any part, of an oil lease from *ad valorem* taxes. That this is true there can be no manner of doubt, since it is matter of common knowledge, and stated as such by counsel for appellant in brief, that the oil producers of the state, believing the court had misconstrued the legislative intention in the Raydure case, went before the legislature at its 1922 and 1924 sessions, and attempted, without success, to procure a modification by the legislature of the effect of that decision, subsequently reaffirmed in the Associated Producers Company case.

What oil men and administrative officials of the state may have believed the act meant prior to the court's construction thereof, is now relatively unimportant. What they have done since is of much more importance, since it has a direct bearing, under the *stare decisis* doctrine, upon whether that construction, if merely doubtful, should be abandoned.

That the legislative meaning, by the clause in the act "in lieu of all other taxes on *wells* producing said crude petroleum," upon which this whole controversy hangs, is not free from doubt, is clear, and that it is fairly susceptible of the construction that it does not include the entire *lease,* despite the fact that the words "in lieu of" were substituted for "in addition to" before the act was passed, is conceded in the dissenting opinion. It is no easier now than upon either of the two former considerations of the question to determine just what the legislature meant by what it said. The history of the legislation, that is said to make that meaning clear, was considered in that connection upon both of those occasions, and was the cause of a whole court consideration, and the basis of a dissent upon the last one.

These facts are quite sufficient, it would seem, to show that the legislative meaning by the above clause was a matter of such doubt as to warrant the court's adoption of a construction that would render the act valid, as it twice has done, rather than one that would have convicted the legislature of merely wasting its time, as it is now asked to do.

But even if this were not true, we are yet of the opinion that any reasonable consideration of the *stare decisis* doctrine demands that the court's construction of the act, since reaffirmed, shall not now be departed from and

those cases overruled because of any lingering doubt of their soundness, after the state finances and the business of the oil producers in the state have been adjusted thereto, and two subsequent legislatures have, at least tacitly, approved such construction by refusing to modify it.

This conclusion disposes of appellant's contentions that the act of 1917 as amended in 1918, and now section 4223c-1 of the statutes, imposes a property tax rather than a license tax, and that it is violative of the state Constitution for any of the reasons considered in the two cases, *supra*.

Additional grounds upon which the validity of the act as amended is now attacked are, that: (1) Its subject is not expressed in its title, as required by section 51 of the Constitution, (2) it imposes a burden upon interstate commerce, forbidden by federal Constitution, and (3) it violates the due process of law provision of the 14th Amendment to that instrument, in that it imposes a tax without affording the taxpayer an opportunity to be heard at any stage of the proceedings.

We might, as in the Raydure case, dispose of each of these contentions upon its merits, and then show that, even if meritorious, that fact could not affect the decision of this case. We shall, however, for the sake of brevity, confine our discussion to an effort to show that the latter of these propositions is true.

Each of these criticisms is leveled at, and can affect only, the amendment of 1918, and there is, and could be, no criticism of the title of the original act passed in 1917, or any claim that it imposed any burden upon interstate commerce, or that it did not afford the taxpayer ample opportunity to be heard before the tax attached.

The original act imposes, just as does the amendment, a graduated occupational tax, measured by the amount of business done by each and every oil producer in the state. The amendment is simply a re-enactment of the original act, with the latter's administrative features so changed as to make the collection of the tax both more certain and less burdensome upon the taxpayer and the assessing and collecting officials. If any or all of the above contentions are sound, the amendment would be destroyed, but this would leave the original act in force, and unamended. Precisely the same tax would have been collected from oil producers in either event.

This is a proceeding by such a taxpayer to repossess himself of taxes paid the state, under authority of a

statute which permits a refund thereof to him only if the taxes were improperly paid. If it be admitted that the amendment, for any of the reasons assigned, is invalid, it simply results that the same taxes paid thereunder, and in accordance with the method thereby prescribed, would have been due and payable under the method prescribed for assessment and taxation by the original act, and no matter which method for assessment and collection is approved, the tax is precisely the same, and in neither event is its recovery permissible.

Wherefore, the judgment is affirmed upon the direct appeal, and reversed upon the cross-appeal, with directions to dismiss the petition.

The whole court sitting, and Judge Dietzman dissenting.

### DISSENTING OPINION BY JUDGE DIETZMAN.

Believing that the majority opinion in this case arrives at a result never contemplated nor intended by the legislature, and that this result works a grave and unmerited injustice upon the oil producing industry of this state, I must respectfully dissent from that opinion.

From the record and from facts judicially known, we gather the following history of the events leading up to the passage of the oil production tax here in question, and of the events which succeeded its passage and which accompanied its interpretation by the administrative officers: Before the outbreak of the World War, oil production in this state had not amounted to very much, but with the coming of that catastrophe and the consequent increase in the price of crude oil, development became very rapid. With development came questions of taxation theretofore but of little, if any, importance. Just how were oil leases and producing wells to be assessed and taxed? Our assessors and taxing officials had had but scant experience with this class of property and they were much perplexed as to just what principle to adopt in such assessment and taxation. After several plans had been tried and rejected, finally an arbitrary method was agreed upon by which the wells and leases were assessed at so much per barrel on the daily production on assessment day. For instance, if the agreed valuation was $1,000.00 per barrel and the production from a particular lease was ten barrels per day on assessment day, the property was assessed at

$10,000.00. However, this plan was also not satisfactory because the lease which produced ten barrels on assessment day might in a short time thereafter become bone dry, or on the other hand, through further development, might produce one hundred barrels a day. And so the hunt for a satisfactory assessment principle continued until the legislature met in the special session of 1917, following the adoption of the amendment to section 171 of the Constitution providing for the classification of property for taxation and for the imposition of varying rates of taxation according to class—a new idea in our taxing laws.

This session of the legislature was devoted to revising the tax laws of the state. Among such laws proposed was one embraced in House Bill No. 49, which, with the change hereinafter mentioned, was later enacted into the law known now as the ''oil production tax law of 1917.'' House Bill No. 49, as originally drafted, so far as pertinent, read:

> ''Every person, firm, corporation or association, engaged in the business of producing oil in this state, by taking same from the earth, shall, *in addition to the other taxes* on the wells producing said oil imposed by law, annually pay a tax for the right or privilege of engaging in such business in this state equal to one per centum of the market value of all oil produced in this state,'' etc.

In this form the bill passed the House. When it reached the Senate the oil producers of the state presented a protest to the committee which had the bill under consideration, contending that this tax added to the *ad valorem* tax, would impose a burden so heavy on the oil business as to destroy it. Out of the investigation developed by this protest, the principle that a tax on oil property measured by its actual production was the most satisfactory tax of all was evolved and it was thought that the amount of tax collected in this way and at this rate would fairly approximate the amount of a tax collected on a fair *ad valorem* assessment. This principle was agreeable to all concerned, including the Senate committee, which had the bill in charge, the then attorney general, the Honorable M. M. Logan, who was advising the legislature in its consideration of the various tax bills before it, and the oil producers. Accordingly House Bill No 49, then before the Senate, was amended

by striking out the words "in addition to the" which preceded the words "other taxes imposed by law," and substituting the words *"in lieu of all,"* as that the tax imposed was *"in lieu of all other taxes* on the wells producing said oil imposed by law." As thus amended the bill passed the Senate, and on its return to the House the amendment was concurred in and the bill as so amended became law. (Acts 1917, chapter 9). The act passed at the 1918 session of the legislature (Acts 1918, chapter 122), which superseded the 1917 act we have been considering and which is the act under which the oil production tax before us was collected, is, when fairly considered, but a re-enactment of the 1917 act, with the latter's administrative features changed so as to make the collection of the tax less burdensome and more assured. Like the 1917 act, its parent, the 1918 act, too, reads that the oil production tax is imposed *"in lieu of all other taxes* on the wells producing said crude petroleum."

After the adjournment of the 1917 special session of the legislature, the Hon. M. M. Logan, at the solicitation of the Governor of the Commonwealth, resigned his office of attorney general and accepted that of chairman of the State Tax Commission, created at this special session and entrusted with the administration of the newly enacted tax laws.

Pursuant to the law as all understood it at the time it was passed, the State Tax Commission proceeded to tax the various oil leases over the state with the oil production tax above mentioned and did not levy any *ad valorem* taxes on producing property. This state of affairs continued until 1918, when the board of supervisors of Estill county undertook to assess for *ad valorem* taxes certain oil leases of one Raydure. This they did by assessing the acreage in the lease less five acres surrounding each producing well. On the wells and the surrounding five acres no assessment was made nor tax levied. The right of Estill county so to assess the Raydure leases was promptly challenged. Up to this time no interpretation had been put by the courts on either the 1917 or 1918 act. By these acts, the oil production tax was imposed "in lieu of all other taxes on the wells producing the oil." Estill county took the stand that this law did not exempt the entire lease from *ad valorem* taxes but only "the wells" which, by fair interpretation, meant so much of the surrounding acreage as was necessary to support that well. It had been decided in Wolfe County v.

Beckett, 127 Ky. 252, 105 S. W. 447, that oil leases as such were subject to the *ad valorem* tax. It now became necessary to determine to what extent, if any, they were relieved from such taxation by the oil production tax law. And so the matter came to this court in the case of Raydure v. Board of Supervisors of Estill County, 183 Ky. 84, 209 S. W. 19. After disposing of some preliminary questions not here pertinent, this court, in that case, next took up the oil production tax law of 1918. Raydure based his defense on this law and the position he took is thus stated by the court:

> "In other words, the argument rested on this statute is that when a producing well is found by the lessee of an oil lease the tax on the oil produced from the well exempts from further or other taxation the lease, not only on the particular premises that may be said to be included in the well, but the remainder of the lease, and, of course, if this argument is sound, the leases here sought to be and that were taxed in the lower court are wholly exempt from taxation, although they might have a large value on account of the exclusive privilege conferred by the leases to drill for and produce oil in other parts of the leased premises not reached by the producing wells."

After thus stating appellant's position, the court further said:

> "It would also necessarily follow, if the position of counsel is well taken, that the production tax would be substituted for and take the place of the *ad valorem* or property tax that we have held the oil leases subject to.
>
> "In considering this contention the first question that naturally suggests itself is, was it the purpose of the legislature in the enactment of this production tax statute that the tax imposed should be in lieu of the *ad valorem* or property tax to which the oil lease covering the producing territory was subject, and, if such was the intention of the legislature, did it, under the Constitution, have the power to provide that a production tax might be in lieu of a property tax to which the property would be subject except for the production tax?"

Considering the questions thus propounded. the court first took up the power of the legislature to substi-

tute a license tax for an *ad valorem* tax and decided that
under our Constitution the legislature had no such power.
In this, I entirely agree. The court should have stopped
there, because that was all that was necessary to dispose
of the case. But having decided that the legislature had
no power to substitute the license tax for the *ad valorem*
tax, the court proceeded to the perfect *non sequitur* of
"ergo, the legislature did not intend to make such sub-
stitution;" and this on the principle that it is the duty of
the court to sustain the constitutionality of legislative
acts where possible and to presume that the legislature
intended a constitutional rather than an unconstitutional
result. The history of this legislation as I have outlined
it is in my judgment a *reductio ad absurdum* of the ap-
plication of such principle to the facts of this case.

It is stated, however, that be this as it may, never-
theless as the court did base its decision on this latter
ground it must be considered as binding authority on the
proposition now before us. Although I will show shortly
that the court itself did not so regard its reasoning in this
connection, yet I also believe that this proposition ad-
vanced is a strained extension of the doctrine of *stare
decisis*. This doctrine is based upon the principle that
certainty in law is preferable to reason and correct legal
principles. But there is no uncertainty in the adminis-
tration of law when those seemingly affected by its ap-
plication have not conducted their affairs in accordance
with its so-called mandate but in direct defiance thereto.
Such is the case here, as I will shortly show. The reason
for the rule failing, the rule should not be applied.

As stated though, the court itself did not regard its
decision as a binding declaration of the constitutionality
of this oil production tax law, for after fininshing its dis-
cussion of the abstract power of the legislature to levy
a license tax on oil production, in which abstract discus-
sion I concur, the court said:

"It follows from what has been said that the
production tax on the oil produced is separate and
distinct from the *ad valorem* tax to which the leases
are subject, and cannot operate to exempt them from
the property tax.

"It will be noticed that, according to the agreed
state of facts, the taxing authorities of Estill
county, in determining the value of the leases, ex-
cluded from the territory covered by the wells five

acres surrounding each producing well, and only estimated the value of the leases as covering the remainder of the leased premises. Whether the board of supervisors had the authority under the statute to make this exemption of five acres or any number of acres, or whether more acreage should be exempted, we do not feel called on to determine in this case, as it does not appear from the agreed statement of facts that Raydure is complaining of the action of the board in exempting five acres surrounding each well."

The court expressly not deciding whether or not Estill county had the authority under the oil production tax law to make the exemption of five acres it did, how can it be said that the court held this license tax to be valid and binding although its imposition would not carry with it the exemption from the *ad valorem* tax? As the oil production tax law merely exempted the well it cannot be said that the taxing on an *ad valorem* basis of so much of the lease as was not fairly included within the term "well" raised any question concerning the validity of the exemption of the well and what was fairly included within that term from *ad valorem* taxation.

The *ratio decidendi* of the Raydure case then may be fairly stated as this: The oil production tax is not a substitute for an *ad valorem* tax to the extent of exempting from taxation so much of an oil lease as exceeds five acres surrounding each producing well. In this *ratio decidendi* I concur.

The history of events following the decision in the Raydure case supports my view, for the taxing authorities headed by the able ex-attorney general in obedience to the court's mandate proceeded to assess for *ad valorem* taxation oil leases but continued to exempt from such taxation the oil wells and five acres surrounding each of them. They did even this with apologies to the oil industry for what was regarded as a breach of faith.

Two legislatures passed without any action being taken by the lawmaking bodies on the result of the Raydure case. This does not mean that these legislatures concurred in any idea which the court may have entertained that the legislature did not intend by the oil production tax law to substitute the license tax for the *ad valorem* tax because the substitution had continued to be

made by the taxing authorities since then, only the substitution had been partial and not total, *i. e.*, only to the extent of the wells and five surrounding acres. Probably after all, this was a fair interpretation of the 1918 act because that act did not exempt the lease but only the well and what "the well" meant was a matter of interpretation. And the way this court left the discussion in the Raydure case fairly lent color to the proposition that after all it simply decided that the oil leases outside of the five acres surrounding each well were subject to the *ad valorem* tax, which decision did not necessarily and expressly did not at all carry with it a decision that the wells and five acres were also subject to such tax. With the matter in this shape the passive position of the legislatures cannot be fairly said to be more than a concurrence in what was being done by the taxing authorities under the Raydure case, which was the exempting from *ad valorem* taxation of wells and their five surrounding· acres.

In 1924, after the legislative session of that year had adjourned, the case of Associated Producers Company v. Board of Supervisors of Estill County, 202 Ky. 538, 260 S. W. 335, was decided. In this case the question of the exemption from *ad valorem* taxation of the five surrounding acres was presented, and this court rightly held, in my judgment, that the legislature had no right to exempt from *ad valorem* taxation any part of an oil lease because of the payment of the oil production license tax. But this court in its short opinion did not discuss the validity of the oil production tax *per se* and rather curiously withdrew as inapt that part of the Raydure case which, in my judgment, not only was apt but was exactly what the court was called upon to determine. The part of the Raydure case withdrawn in the Associated Producers case marked off the limits, in negative fashion, of the court's decision. I cannot regard the Associated Producers case as an authority for the validity of the oil production license tax.

As soon as this case was decided, consternation reigned in the camp of the oil people, for unless the oil production license tax be invalid, they were subject to the double tax which the 1917 legislature had expressly declined to impose on them because of the unwarranted burden. Whereupon this suit was promptly brought to test that question.

I believe the results reached in the Raydure and the Associated Producers cases to be right, but by them it is only decided that the legislature had no authority to substitute an oil production license tax for an *ad valorem* tax. Whatever its authority, nevertheless this is exactly what the legislature tried to do and did do. It is shown that when the 1917 act was up for consideration, the legislature actually *abandoned* the idea of levying both a license and an *ad valorem* tax as it had started out to do because of the unwarranted burden which would result for the oil industry. We now by judicial decision arrive at just this result which the legislature wished to avoid. I believe it to be demonstrated that the legislature did not mean to place this double burden on the oil industry, and that its imposition of the license tax is so interwoven with the exemption from *ad valorem* taxation that the one would not have been imposed but for the exemption from the other. As we have held that it was unconstitutional to so exempt, the license tax must then fall, because it cannot be separated from the exemption without doing violence to the legislative intent. Deferring to the ability and learning of those with whom I disagree, I have felt it necessary to express at this length my reasons for dissenting from the majority opinion by this court on the cross-appeal.

On the original appeal, I concur in its affirmance on the authority of Barriger v. Louisville Gas & Electric Co., 196 Ky. 268, 244 S. W. 690.