## Cumberland Pipe Line Company v. Commonwealth.

(Decided March 15, 1929.)

454

EDW. C. O'REAR and CRAWFORD & HARRIS for appellants.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

The sole question presented by this appeal is whether chapter 122 of the Acts of 1918, hereinafter called the 1918 act, violates the Federal Constitution or not. The title to that act is:

"An Act to amend and re-enact chapter 9 of the Acts of the extraordinary session of the General Assembly of 1917, which Act imposes a license or franchise on any person, firm, corporation, or association engaged in the production of crude petroleum in this State, and authorizing county officials to impose such tax for roads, schools and county purposes; providing methods of determining the amount of tax due and prescribing the manner of payment of State tax and imposing penalties for the violation of the Act."

The pertinent provisions of the act necessary to a solution of the issues raised are:

"Sec. 1.    Every person, firm, corporation or association producing crude petroleum oil in this State, shall, in lieu of all other taxes on the wells producing said crude petroleum, annually pay a tax equal to 1 per centum of the market value of all crude petroleum so produced, and such tax shall be for State purposes, and, in addition, any county in the State may impose a like tax for road purposes, county purposes or school purposes not to exceed one-half of one per centum of the market value of all crude petroleum produced in such county, and the fiscal court of any county may levy said tax for county purposes and shall determine what fund or funds shall receive the taxes when collected, and, when crude petroleum is produced in any separate taxing district in a county, the fiscal court shall equitably distribute such taxes between the county and such taxing district. . . .

"Sec. 3.    The tax hereby provided for shall be imposed and attach when the crude petroleum is first transported from the tanks or other receptacles located at the place of production. . . .

"Sec. 5.    Every person, firm, corporation or association engaged in the transportation of crude

petroleum in the State from the tanks or other receptacles located at the place of production in the State, shall for the purposes of this Act, be considered a transporter of crude petroleum, and every such transporter of crude petroleum shall make a monthly, verified report to the State Tax Commission, on or before the 20th day of the month succeeding the month in which the crude petroleum is so received for transportation, showing the quantity of each kind or quality of all crude petroleum so received from each county in the State and the market value of such crude petroleum on the first business day after the tenth day of the month in which such report is made and such report shall show any sales of such crude petroleum so received, in which event it shall show the quantity of crude petroleum in each sale, the date of each sale, and the market price of such crude petroleum on each date of sale for such preceding month, and said report shall be made upon blanks furnished and prescribed by the State Tax Commission.

"Sec. 6. The State Tax Commission shall, upon receiving the reports provided for in section 5 hereof, upon such reports and such other reports and information as it may secure, assess the value of all grades or kinds of crude petroleum so reported for each month, and, on or before the last day of the month in which such reports are required to be made, notify each transporter of crude petroleum so reporting of such assessment, and certify such assessment to the county clerk of each county which has reported the levy of the county tax provided for in section 2, for record, and such county clerk shall immediately deliver a copy thereof to the sheriff of such county for the collection of such county tax. The transporter so notified of the assessment shall have until the twentieth day of the month following such notice, in which to be heard by the State Tax Commission on any objection to such assessment, and the assessment shall become final on such twentieth day of the month and the tax be due and payable on that day. The State Tax Commission shall make the assessment of the value of the crude petroleum so reported by each transporter of crude petroleum as follows:

"Where the report shows no sale of crude petroleum during the month covered by such report, then the market value of crude petroleum on the first business day after the tenth day of the month in which the report is made shall be fixed as the assessed value of all crude petroleum covered by such report.

"But where the report shows sales of crude petroleum during the month covered by such report, if it shows that all crude petroleum so reported has been sold, then the market price of such crude petroleum on each day of such sale or sales shall be the assessed value of all crude petroleum sold on such date of sale and the total amount of the tax to be reported as the assessment on such report shall be the total of the assessment or assessments made on such sale or sales; but if such report shows that any part of the crude petroleum so reported remains unsold, then as to such portion remaining unsold the market price of the crude petroleum on the first business day after said tenth day of the month following the month covered by such report, shall be fixed as the assessed value of such portion of the crude petroleum unsold, and the total amount of the tax to be reported as the assessment on such report shall be the total of the assessments made on such sold and unsold crude petroleum.

"The State Tax Commission in making its assessments shall take into consideration transportation charges.

"Sec. 7. Every person, firm, corporation or association required to make report as provided in section 5 hereof, shall be responsible and liable for the taxes as herein set forth on all crude petroleum so received by it, and shall collect from the producer in either money or crude petroleum the taxes imposed under the provisions of this act; but, if collection is in crude petroleum, such transporter is authorized and empowered to sell the same, and pay said taxes by check or cash to the State Tax Commission or sheriff, as provided in this act."

By a stipulation as to facts, the parties agree:

"The methods employed in connection with the receipt and transportation of crude oil by the Cum-

berland Pipe Line Company within and through the
state of Kentucky are as follows:

"The producer pumps the oil from his well into
his own tank. These tanks, which are sometimes of
wood and sometimes of iron, vary greatly in size, but
most of them are relatively small, containing, when
full, less than one hundred barrels of crude oil.
. . . The Pipe Line Company attaches its pipe to
the tank a few inches above its bottom and controls
the flow by a stop-cock in the pipe. . . .

"The producer notifies the company that he de-
sires the latter to take oil from a certain tank, but
it is not known beforehand just how much oil is in the
tank, nor does the producer usually name a definite
amount which he wishes withdrawn. In a general
way, the Pipe Line Company expects, and is ex-
pected, to take all of the good oil which it can safely
remove from the tank at the moment. . . . (The
oil is gauged by the gauger of the Pipe Line Com-
pany.) The stop-cock is then turned and the oil is
allowed to run from the tank into the pipe until the
surface of the oil in the tank has fallen to a point
which the gauger considers safe, when the stop-
cock is closed. . . . The actual oil as it leaves the
tank passes immediately into and through the com-
pany's pipes and joins the stream of oil which is
moving through the state, and a large part of which
(from 60 to 98 per cent during the past ten years)
goes, and has always gone, across the state line into
other states. . . .

"The oil which remains in the state is not sep-
arated in any way from that which goes out of the
state until the former is withdrawn from the stream
at the point of delivery. The passage of the oil
through the pipes of the Cumberland is substantially
continuous from the instant that it is received until
it either crosses the state line or is delivered at some
point within the state.

"While the foregoing are the facts as to the
actual oil, the business transaction is as follows:

"As soon as practicable after the oil is received
into the Cumberland line, the run clerk computes
from the gaugers' reports the amount of oil which
was withdrawn from the tank. An account is kept
with the state, with each county and with each party
interested in the production. One per cent (1%) of

the amount withdrawn from the tank is credited to the state on the books of the company; then one-half of one per cent (½%) is credited to the county in which the oil is produced, provided the county has informed the company that they are to collect the tax. . . . The remaining 98½% or 99%, as the case may be, is then divided and credited on the books of the company to each of the several owners as indicated by the division order on file with the company. The above accounts are all known as credit balances. From this time forward, all the business is carried on through such credit balances. While the actual oil may have long since gone out of the state or have been delivered and used within the state by others, the credit balance of the shipper may remain on the company's books for a long time, and the company is not discharged from its liability until it delivers to the shipper or his assignee or consignee an amount of oil equal to that called for by the credit balance, and of the same grade and kind. On the other hand, the said act of 1918 permits the company to sell an amount of oil corresponding to the credit balance of the state and to pay the proceeds of the same over to the State Tax Commission or sheriffs of different counties, as specified in the said act of 1918, and this practice was followed until on or about March 31st, 1926, since which time the proceeds of the oil collected and sold by the company have been deposited in certain banks, under the agreement filed with the petition herein, dated October 5th, 1926.

"It is further stipulated as follows: . . .

"The expense to the Cumberland Pipe Line Company, because of the duty imposed on it by the act of 1918, is no greater, not as great, than imposed on it in reporting the oil handled by it, under the act of 1917."

It is insisted that the 1918 act is unconstitutional, because, first, it imposes a tax on interstate commerce, and secondly, it does not afford the real taxpayer a hearing before the assessing authorities in respect to the assessment value of the oil. The lower court found the act constitutional, and from its judgment this appeal is prosecuted.

In order to determine the merit or lack of merit in the appellant's contention that the 1918 act imposes a tax on interstate commerce, we must first ascertain the character of the tax imposed by that act—whether it be a property tax on the oil or a graduated occupational tax measured by the amount of business done by the oil producer in the state. The federal district court for the Eastern District of Kentucky in the case of Eastern Gulf Oil Co. v. Kentucky State Tax Commission, 17 F. (2d) 394, was of the opinion that the tax was a property tax and not an occupational tax. But with us the question is foreclosed by our opinion in the case of Swiss Oil Corp. v. Shanks, 208 Ky. 64, 270 S. W. 478. (See, also, same case 273 U. S. 407, 47 S. Ct. 393, 71 L. Ed. 709.) We there said:

"Section 4223c-1 of the statutes, under which the taxes that appellant seeks to compel the auditor to refund were laid and collected, is an act of the 1917 session of the Legislature, as amended at the 1918 session. . . .

"The original act imposes, just as does the amendment, a graduated occupational tax, measured by the amount of business done by each and every oil producer in the state. The amendment is simply a re-enactment of the original act, with the latter's administrative features so changed as to make the collection of the tax both more certain and less burdensome upon the taxpayer and the assessing and collecting officials."

The tax then being a graduated occupational tax, is it a burden on interstate commerce? Relying upon section 3 of the 1918 act, appellant says:

"The critical words here are 'first transported from the tanks.' The oil is 'first transported from the tanks' when it first enters the appellant's pipes. Prior to that time it has been stationary in the producer's tank. The instant that the stop-cock is turned and the oil begins to flow out of the tank into the appellant's lines, it joins the stream of oil and its transportation begins. The language of the third section of the act is clear as to what follows and admits, we submit, of no other interpretation than that the tax is imposed and attaches while the oil is in the stream, and, therefore, is imposed upon interstate commerce."

Were this tax a property tax, or a tax on the business of transporting crude petroleum, appellant's argument might be sound. But, as construed by us, the tax is not a property tax, but a graduated occupational tax imposed, not on the business of shipping, transporting, or selling crude petroleum in inter or intra state commerce, but on the business of producing the oil from oil wells in this state. Section 3 of the act does no more than to specify the moment of time when the liability on the producer of the oil from oil wells for the tax imposed on the business of producing such oil becomes fixed although under other sections of the act he has a further period of time within which to discharge that liability. The tax under the 1918 act is not imposed upon nor does it attach to the oil or crude petroleum at any time. Neither is it a tax upon the carrier of the crude petroleum. The tax is imposed upon the producer alone and for the privilege of engaging in the business of producing crude petroleum from oil wells in this state. As in the case of the tax involved in Brown-Forman Co. v. Kentucky, 217 U. S. 563, 30 S. Ct. 578, 54 L. Ed. 883, the exaction is not upon the product at all, but upon the business of producing the product in this state. In this, the tax is like unto those upheld in Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929; Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Hope Natural Gas Co. v. Hall, 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049. In the Oliver Iron Mining Co. case the court said:

"The ore does not enter interstate commerce until after the mining is done, and the tax is imposed only in respect of the mining."

So, here, the oil does not enter interstate commerce until after it has been produced from the well and the tax is imposed only in respect to such production. The producer's liability for this tax becomes fixed at that moment of time when the oil sets out on its journey, be it inter or intra state. But the state had a right thus to postpone the fixing of the liability for the tax imposed upon the occupation of producing the oil, since this served to mitigate the burden upon the producer. As is well known, the production per well in this state, save in some instances, is not large, and to postpone the fixing of the liability for the tax until the producer is ready to run his oil into the pipe lines is a real benefit to him,

even as the postponement of the ascertainment and payment of the internal revenue tax upon distilled spirits was, in its day, a real benefit to the distiller. But the postponement does not serve to change the tax from the production tax we have seen it to be to a tax upon interstate-commerce. In the case of American Mfg. Co. v. City of St. Louis, 250 U. S. 459, 39 S. Ct. 522, 63 L. Ed. 1084, a local tax levied upon the business of manufacturing within the city of St. Louis and computed upon the sales of goods so manufactured was upheld. The Supreme Court quoted from the opinion of the Supreme Court of Missouri (270 Mo. 40, 192 S. W. 402):

"We hold that the tax in question is a tax upon the privilege of pursuing the business of manufacturing these goods in the city of St. Louis; that when the goods were manufactured the obligation accrued to pay the amount of the tax represented by their production when it should be liquidated by their sale by the manufacturer."

The Supreme Court then went on to say:

"The city might have measured such tax by a percentage upon the value of all goods manufactured, whether they ever should come to be sold or not, and have required payment as soon as, or even before, the goods left the factory. In order to mitigate the burden, and also, perhaps, to bring merchants and manufacturers upon an equal footing in this regard, it has postponed ascertainment and payment of the tax until the manufacturer can bring the goods into market. A somewhat similar method of postponing payment has been pursued for many years by the Federal Government with respect to the internal revenue tax upon distilled spirits."

What we have said being true, the 1918 act does not violate the commerce clause of the Federal Constitution, unless, as said by Judge Cochran in the Eastern Gulf Oil Company case, supra, even if the tax be deemed an occupational tax, it cannot be upheld, because "the amount of the tax to be paid is measured by the value of the oil produced, not whilst it is in the producer's possession, but after it has left its possession and passed into that of the transporter, and has become an article in interstate commerce."

The title to the act of 1918 limits the scope of its operation to a "license or franchise" on those "engaged in the production of crude petroleum in this state." It provides for the payment annually of a tax equal to one per centum of the market value of all crude petroleum produced. Section 1. The state tax commission must find the market value from monthly reports showing sales of such crude petroleum and certain other details (section 5), and from such other reports and information as it may secure (section 6), but the commission is directed to make an appropriate allowance for the cost of transportation from the producing wells to the market (section 6). This does not mean that the amount of the occupational tax is to be measured by the value of the oil in the hands of the transporter. It requires that the value at the wells shall be ascertained from the evidence of the market value after the oil has completed its journey through the channels of commerce and has been sold in the market. It is but a means adopted and prescribed to find the market value of the oil at the well where it was produced. There is seldom, if ever, a market at the place of production. The product must be carried to the markets. The value at the place of production is the selling price less the cost of transportation to the place of sale. The act requires the state tax commission to resort to the same sources for evidence that would naturally and necessarily be selected to establish the fact of market value if the act were silent upon that subject. The method is not a new one, but conforms to the legal rules of evidence for the ascertainment of market value. 22 C. J. sec. 151, p. 187; 35 Cyc. 638; Woerman v. McKinney-Guedry Co., 174 Ky. 521, 192 S. W. 684.

The market value of a commodity is its selling price in the usual and ordinary course of business, but, if there be no market at a particular place at which it is desired to fix the market value, then the market value is taken at the nearest point available, with adjustments to care for the cost of transportation to that market. Campbellsville Lumber Co. v. Bradlee & Wiggins, 96 Ky. 494, 29 S. W. 313; Log Mountain Coal Co. v. White Oak C. Co., 163 Ky. 842, 174 S. W. 721. The plain mandate of the act of 1918 is that the tax commission shall find the market value at the place of production by taking the actual sales as reported from the pipe line companies, and such other evidence thereof as may be available, and deducting therefrom the carriage charges. The result reached in

that way is the market value of the oil at the wells. This construction of the statute accords with its language and conforms to its title.

In the case of Hope Natural Gas Co. v. Hall, 102 W. Va. 276, 135 S. E. 582, the court said:

"By the terms of the statute the tax is to be calculated on the value of the article produced, and that value is to be shown by the gross proceeds of its sale. . . .

"We are warranted in presuming that the legislature did not mean to include, as an element of value, so much of the gross proceeds of the sale of an article in interstate commerce, as is represented by the cost of transportation, and we restrain the operation of the statute accordingly. This presumption and this limitation are strengthened by the concluding sentence of the statute, whereby the measure of the tax is declared to be the value of the product *in this state,* regardless of place of sale or delivery outside the state. If the sale of a commodity produced in this state imposes on the seller delivery in another state, then the sale price necessarily includes the cost of the delivery. Such *sale price* would not reflect the worth of the commodity *in the state,* but the worth within the state plus the cost of transportation. If the taxation value of the products named in the statute be limited to their value *in the state,* and before they enter interstate commerce, the statute does not manifest a purpose to violate article 1 of the Federal Constitution, and we so hold."

In affirming that case the Supreme Court of the United States said (274 U. S. 288, 47 S. Ct. 640, 71 L. Ed. 1049):

"Counsel admit that without violating the commerce clause the state may lay a privilege or occupation tax upon producers of natural gas reckoned according to the value of that commodity at the well. American Mfg. Co. v. St. Louis, 250 U. S. 459, 39 S. Ct. 552, 63 L. Ed. 1084; Heisler v. Thomas Colliery Co. 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Oliver Iron Min. Co. v. Lord, 262 U. S. 172, 67 L. Ed. 929, 43 S. Ct. 526. But they insist that, accepting the statute under consideration as construed by the highest court of the state, plaintiff in error will be

subjected to an unlawful direct tax upon gross receipts derived from interstate commerce. This argument rests chiefly upon certain language excerpted from the opinion below. But we review the final decree and must accept the statute as authoritatively construed and applied. The plain result of the opinion and final decree is to require that the tax be computed upon the value of the gas at the well, and not otherwise. If, hereafter, executive officers disregard the approved construction and fix values upon any improper basis appropriate relief may be obtained through the courts.''

It is no objection to the validity of the legislation that the amount of the tax on the producer is measured by the value of the thing produced. Strater Bros. v. Commonwealth, 117 Ky. 604, 78 S. W. 871; Brown-Foreman Co. v. Commonwealth, 125 Ky. 402, 101 S. W. 321, affirmed 217 U. S. 563, 30 S. Ct. 578, 54 L. Ed. 833. Nor is such an act subject to attack under the Federal Constitution on the ground that the volume of sales upon which the amount of the occupational tax is adjusted includes sales of goods that have been or may be articles of interstate commerce. American Mfg. Co. v. City of St. Louis, 250 U. S. 459, 39 S. Ct. 522, 63 L. Ed. 1084. While interstate commerce itself cannot be taxed, the receipts of property or capital employed therein may be taken as the measure of a lawful state tax. Hart Refineries v. Harmon, 49 S. Ct. 188, 73 L. Ed. —; Great Northern Ry. Co. v. Minnesota, 49 S. Ct. 191, 73 L. Ed. —; Baltic Mining Co. v. Mass., 231 U. S. 68, 34 S. Ct. 15, 58 L. Ed. 127; Maine v. Grand Trunk Ry. Co., 142 U. S. 217,12 S. Ct. 121 35 L. Ed. 994; Provident Institution v. Mass., 6 Wall. 611, 18 L. Ed. 907; Flint v. Stone Tracy Co., 220 U. S. 107, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; U. S. Express Co. v. Minn., 223 U. S. 335, 32 S. Ct. 211, 56 L. Ed. 459. The receipts of the carrier are not taxed. Its property is not taxed. Indeed, the carrier or transporter is not taxed at all. The tax falls upon the producer alone, and it is measured, not by the receipts of the carrier, but by the value of the product.

It is not correct to say that the tax is measured by the value of the oil after it has become an article of interstate commerce. In its final analysis, the tax is measured by the market value of the product at the place of production. It is quite true that the value is ascertained by

taking evidence of sales in another state after the article has been carried in interstate commerce, but the use of such evidence is not forbidden. It is not put "apart in a kind of civil sanctuary," where the state may not venture for facts relevant and important in the administration of its tax laws. Davis v. C., C. C. & St. L. R. Co., 217 U. S. 157, 30 S. Ct. 463, 54 L. Ed. 708, 27 L. R. A. (N. S.) 823, 18 Ann. Cas. 907; Baltic Mining Co. v. Mass., 231 U. S. 68, 34 S. Ct. 15, 58 L. Ed. 127. It is not possible to find the value of mineral products at the mine, where there is no market, except by taking the value at the nearest market and deducting the cost of transportation. Interstate commerce is not affected or burdened by the use thus made of evidence resulting from transactions therein. There is no basis for the contention that the tax on the producer is invalid because the amount of the assessment is ascertained by considering incidents, facts, or results flowing from interstate commerce. American Mfg. Co. v. St. Louis, 250 U. S. 460, 39 S. Ct. 522, 63 L. Ed. 1084. In the Hall case, 102 W. Va. 272, 135 S. E. 582, affirmed 274 U. S. 285, 47 S. Ct. 639, 71 L. Ed. 1049, the producer and carrier of the natural gas were the same corporation, and the act levied the tax at the well based on the entire production wherever sold. As the carrier was also the producer, the result was that the selling price corresponded closely to the gross receipts, and the act was susceptible to the construction that the gross receipts for the gas produced, including the interstate transportation, was subject to the tax. The Supreme Court of Appeals of West Virginia construed the act to exclude the cost of transportation by limiting the power to tax to the place of production. The Kentucky act of 1918 expressly requires the cost of transportation to be given proper weight, and applies by its terms to the producer alone. The carrier is but an instrumentality or agency adopted for convenience in collecting the tax, and it is expressly stipulated (section 4 of the stipulation) that the 1918 act imposes no greater burden on the carrier than did the act of 1917, which is confessedly valid. The West Virginia act, as construed by the Supreme Court of Appeals, was upheld, and our act is written precisely as the West Virginia act was construed. Such being the purposes, effect, and terms of the act, it does not offend the commerce clause of the Constitution of the United States because the occupational tax is graduated according to the value of the product at the well, although

that value necessarily must be ascertained from evidence derived from the carrier and transactions in the market made after the oil has been transported in interstate commerce.

The second ground upon which the 1918 act is attacked is that it violates the due process clause of the Fourteenth Amendment of the Federal Constitution, in that it does not grant to the real taxpayers a hearing before the state taxing authorities in respect to the assessment of value. It is a principle of constitutional law that no one has a right to attack a statute as unconstitutional, unless he can show that its enforcement against him has violated, or will violate, his constitutional rights. Iroquois Transp. Co. v. De Laney, Forge & Iron Co., 205 U. S. 354, 27 S. Ct. 509, 51 L. Ed. 836; Lee v. State of New Jersey, 207 U. S. 67, 28 S. Ct. 22, 52 L. Ed. 106; Missouri, etc., R. Co. v. Cade, 233 U. S. 642, 34 S. Ct. 678, 58 L. Ed. 1135; Mallinckrodt Chemical Works v. Missouri, 238 U. S. 41, 35 S. Ct. 671, 59 L. Ed. 1192; Interstate Busses Corp. v. Holyoke St. R. Co., 273 U. S. 45, 47 S. Ct. 298, 71 L. Ed. 530. The producers of the oil from oil wells upon whom this tax rests are not parties to this suit. They are making no complaint in this litigation about the alleged failure of the act to afford them an opportunity to be heard. The appellant pipe line company is fully protected under the 1918 act, for it has the option of collecting from the producer the tax which it pays either in money or in kind. If it collects in kind, as the stipulation shows it has always done, then the question of assessment value is of no importance either to the transporter or to the producer. In such event, one per centum of the gallonage is deducted from the producer's credit on the book and placed to the state's credit. This deduction is sold along with the other oil, and its proceeds are paid to the state for the tax imposed by the 1918 act. Since the constitutionality of the 1918 act is not open to attack by the appellants on this second ground, they cannot escape because of such contention liability for accounting for the tax it has thus collected.

Finding no error in the judgment of the lower court, it is affirmed.

Whole court sitting.